**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**Gregory Holt**, ADC # 129616
a/k/a **Abdul Maalik Muhammad**,

   *Plaintiff,*

v.

**Dexter Payne**, Director, Arkansas Division of
Correction, in his official capacity,

   *Defendant.*

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUL 1 0 2025

TAMMY H. DOWNS, CLERK
By: _____
       **DEP CLERK**

Case No.  4:25-cv-699-LPR-JJV

## VERIFIED COMPLAINT

This case assigned to District Judge Rudofsky
and to Magistrate Judge Volpe

1

## INTRODUCTION

1.     Plaintiff Gregory Houston Holt a/k/a Abdul Maalik Muhammad ("Mr. Muhammad" or "Plaintiff") is a skilled jailhouse lawyer.  On June 9, 2025, in an attempt to moot at least six different pieces of Mr. Muhammad's meritorious litigation, the Arkansas Division of Correction ("ADC") abruptly transferred Mr. Muhammad to the U.S. Penitentiary in Hazelton, West Virginia.  Mr. Muhammad now seeks a preliminary injunction to reverse the ADC's retaliatory transfer and return him home to Arkansas and the Larry Norris Unit.

2.     Mr. Muhammad is famous among both lawyers and prisoners for representing himself before the district court, Eighth Circuit, and U.S. Supreme Court in *Holt v. Hobbs*, 574 U.S. 352 (2015) ("Beard case").  After the preeminent counsel Prof. Douglas Laycock appeared to argue the merits, the U.S. Supreme Court unanimously held that the ADC's "grooming policy violates [the Religious Land Use and Institutionalized Persons Act] insofar as it prevents petitioner from growing a ½–inch beard in accordance with his religious beliefs." 574 U.S. at 369.  On remand, the district court entered a permanent injunction authorizing Mr. Muhammad to maintain a half-inch beard in perpetuity. *See Holt v. Hobbs*, Case No. 5:11-cv-00164-BSM, ECF No. 165 (E.D. Ark. June 4, 2015).  The U.S. Supreme Court's opinion in *Holt v. Hobbs* is now the seminal precedent for prison religious-accommodation claims nationwide; courts have cited it in more than a thousand subsequent opinions.

3.     In the decade since his unanimous U.S. Supreme Court victory, Mr. Muhammad has filed additional lawsuits to assert his civil rights.  Mr. Muhammad currently has six cases pending in discovery or later phases against the ADC.  This includes a case where, proceeding *pro se*, he secured a preliminary injunction permitting him to wear modest clothing during unit shakedowns. *See Holt v. Payne*, Case No. 4:22-cv-00553-JM-PSH, ECF No. 13 (E.D. Ark.)

("Modesty case"). After the appearance of counsel and pursuant to a settlement, on June 26, 2025,

Judge Harris entered a permanent injunction. *See id.*, ECF No. 91. Judge Harris also instructed

Mr. Muhammad's counsel to file an application for attorney's fees by July 31, 2025. *Id.*, ECF No.

90.

4.      Mr. Muhammad also regularly assists other prisoners in seeking legal relief.

Notably, Mr. Muhammad helped another prisoner obtain an unanimous Arkansas Supreme Court

victory reducing his illegal sentence. *See Bismillah Rahim Muhammad v. State of Arkansas*, 624

S.W.3d 300 (Ark. 2021). As a result of the reduced sentence, Bismillah Rahim Muhammad was

sent home later that year. Mr. Muhammad also prepared a federal habeas petition for a fellow

prisoner which resulted in the appointment of counsel. *See Coakley v. Payne*, Case No. 4:22-cv-

4111-SOH, ECF No. 1-1 (W.D. Ark. Nov. 15, 2022). On June 27, 2025, Judge Bryant in the

Western District of Arkansas conditionally granted Mr. Coakley's habeas petition, recommending

that "The writ of habeas corpus should issue unless the State of Arkansas vacates Petitioner's

conviction for first degree murder and orders a new trial." *Id.*, ECF No. 53 at 37.

5.      The ADC's decision to transfer Mr. Muhammad out of Arkansas and to federal

prison in West Virginia is a retaliatory response to Mr. Muhammad's meritorious litigation. After

Chief Judge Baker ruled in March that all five of Mr. Muhammad's civil rights claims could

proceed in *Holt v. Payne,* No. 4:22-cv-01132-KGB (E.D. Ark.) ("Jailhouse Lawyer case"),

Defendant Director Dexter Payne, Director of the Arkansas Division of Correction, personally

participated in a confidential mediation on May 8, 2025. At this mediation, the parties discussed

a number of potential resolutions to the case, including, as discussed further below, a possible

transfer. However, the Jailhouse Lawyer mediation was not successful and did not result in a

settlement. Instead, Judge Volpe assigned the ADC homework to explore legal accommodation

options for Mr. Muhammad, potentially including a law library job assignment and increased digital access to legal resources. Judge Volpe then publicly reported that "additional work is necessary to reach a settlement." *Id.*, ECF No. 148 (May 8, 2025).

6.      Rather than engage in additional work to accommodate Mr. Muhammad's First Amendment right to petition the courts, Director Payne decided to transfer Mr. Muhammad out of the State of Arkansas and to federal prison. During his participation in the May 8, 2025, mediation, Director Payne got the idea that if he transferred Mr. Muhammad to a federal facility—even over Plaintiff's objection—Director Payne could solve the ADC's problem of defending against Mr. Muhammad's active litigation as well as Mr. Muhammad's efforts to help other Arkansas prisoners. Director Payne then initiated Mr. Muhammad's federal transfer in order to moot Plaintiff's litigation. The ADC has already begun to move to dismiss Mr. Muhammad's active cases as moot. *See, e.g.*, *Holt v. Higgins*, Case No. 4:21-cv-01226-JM-JTK, ECF No. 50 (E.D. Ark. July 3, 2025).

7.      Mr. Muhammad's history of meritorious litigation showcases the ability of the legal system to provide justice to all, including prisoners. The Court should not tolerate the ADC's retaliatory transfer aimed at suppressing Mr. Muhammad's meritorious litigation and legal work. The Court should order the ADC to reverse the transfer, restore the status quo, and bring Mr. Muhammad back home to Arkansas and the Larry B. Norris Unit.

## JURISDICTION AND VENUE

8.      This is an action for declaratory and injunctive relief arising under 42 U.S.C. § 1983 and the First and Fourteenth Amendment to the U.S. Constitution.

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343(a)(3)–(4).

10.     This Court has personal jurisdiction over Defendant Director Payne because he resides and conducts business in the State of Arkansas.

11.     Venue is proper in the Eastern District of Arkansas pursuant to 28 U.S.C. § 1391 because Defendant Director Payne operates within the geographical boundaries of the State of Arkansas, and a substantial part of the acts and events giving rise to Plaintiff's claims occurred in this District.

## PARTIES

12.     Plaintiff Gregory Holt a/k/a Abdul Maalik Muhammad is a skilled jailhouse lawyer engaged in multiple active and non-frivolous litigations against the Arkansas Department of Corrections. Mr. Muhammad entered the custody of the ADC on June 10, 2010, and resided at the Larry B. Norris Unit f/k/a Maximum Security Unit in Tucker, Arkansas, from October 7, 2016 until June 9, 2025. Mr. Muhammad is detained pursuant to Arkansas state law and remains in ADC legal custody, although he now resides in a federal facility. Mr. Muhammad currently resides at the United States Penitentiary, Hazelton in Bruceton Mills, West Virginia. Mr. Muhammad's Arkansas inmate number is ADC # 129616 and his federal register number is BOP # 21696-009.

13.     Defendant Dexter Payne is the Director of the Arkansas Division of Correction within the ADC. He has held this position since July 2019. Director Payne must "[a]dminister the Division of Correction and supervise the administration of all institutions, facilities, and services under the jurisdiction of the Division of Correction." Ark. Code Ann. § 12-27-107(d)(1). The Division of Correction has exclusive jurisdiction to oversee "the care, charge, custody, control, management, administration, and supervision of all persons and offenders committed to, or in the custody of, the state penitentiary." Ark. Code Ann. § 12-27-103(b)(1). Director Payne personally requested and arranged Mr. Muhammad's transfer to a federal facility following Director Payne's

telephonic participation in the unsuccessful mediation on May 8, 2025.  Upon information and belief, Director Payne also had supervisory authority over Deputy Director William Straughn's participation at the Modesty case mediation on May 12, 2025 and authorized the terms of that settlement.  Director Payne is sued in his official capacity.

## FACTUAL ALLEGATIONS

### A.    Plaintiff Has Six Currently Active Litigation Matters Against the ADC.

14.    Mr. Muhammad is a frequent litigant in meritorious cases that survive dismissal. Mr. Muhammad's current cases in active litigation include:

       a.    *Holt v. Payne*, Case No. 4:22-cv-01132-KGB (E.D. Ark.) ("Jailhouse Lawyer case").  Chief Judge Baker has authorized all five asserted claims to proceed to discovery.  Judge Volpe held a confidential mediation on May 8, 2025, which was not successful.

       b.    *Holt v. Payne*, Case No. 5:19-cv-00081-BSM (E.D. Ark.), on remand from Case No. 22-01809 (8th Cir.) ("Jummah case").  Mr. Muhammad's summary judgment motion is pending before Judge Miller.

       c.    *Holt v. Higgins*, Case No. 4:21-cv-01226-JM-JTK (E.D. Ark.) ("Security/Terrorist Threat Groups case" or "STTG case").  Discovery in this matter was wrapping up, with the parties working to schedule Mr. Muhammad's deposition, when Mr. Muhammad was abruptly transferred on June 9, 2025.  On July 3, 2025, the ADC asked Judge Moody to dismiss the case as moot in light of Mr. Muhammad's transfer.  *See* ECF No. 50.

       d.    *Holt v. Payne*, Case No. 4:22-cv-00553-JM-PSH (E.D. Ark.) ("Modesty case").  The parties reached a settlement during a mediation before Judge

Harris on May 12, 2025. Judge Harris entered a permanent injunction on June 26, 2025, and ordered that Mr. Muhammad's motion for fees and costs is due July 31, 2025.

e.     *Holt v. Payne*, Case No. 4:24-cv-00074-BRW-ERE (E.D. Ark.), on appeal at Case No. 25-01507 (8th Cir.) ("Ramadan case"). Mr. Muhammad's opening appellate brief was submitted on June 5, 2025.

f.     *Holt v. Ark. Div. of Corr.*, Case No. 231473 (Ark. Claims Commission) ("*Racial Muslim* case"). Discovery has ended, and a *Daubert* hearing to exclude the declaration of Maurice Culclager (Deputy Warden of the Larry B. Norris Unit) is scheduled for July 11, 2025. Mr. Muhammad represents himself *pro se* in that case and has been unable to access his case file or inform the Court about his transfer.

**B.     Plaintiff Attended Two Mediations with the ADC on May 8 and May 12, Aimed at Resolving the Jailhouse Lawyer Case and the Modesty Case.**

15.     In Mr. Muhammad's Jailhouse Lawyer case, shortly after Chief Judge Baker permitted all five of his claims to proceed, the parties agreed to mediate in front of Judge Volpe. That mediation was scheduled for May 8, 2025.

16.     Mr. Muhammad attended the May 8, 2025, mediation session for the Jailhouse Lawyer case in person. Defendant Director Payne, also a defendant in the Jailhouse Lawyer case, participated telephonically. Larry B. Norris Unit Deputy Warden Culclager, who ultimately reports to Director Payne, attended in person. Mr. Muhammad understood the mediation to be confidential and non-binding, with the mediator encouraging frank conversations and brainstorming. Plaintiff's and defendants' teams sat in separate rooms throughout the day, with Judge Volpe serving as the mediator and switching back and forth. The mediation did not end in

an agreement. The mediator publicly reported that "additional work is necessary to reach a settlement."

17. As part of the May 8, 2025, mediation, Judge Volpe, acting as mediator, suggested the possibility of transfer to a different facility as a potential resolution to this action. Mr. Muhammad informed Judge Volpe that he had long taken the position that a transfer without his consent would be an act of retaliation. Nevertheless, Mr. Muhammad raised the possibility of a transfer to federal prison within the spirit of the mediation. This proposal was merely exploratory, and the parties did not agree to any settlement terms. Shortly after the mediation session ended on May 8, 2025, Plaintiff's counsel wrote to Judge Volpe and defendants' counsel that Mr. Muhammad had concerns about agreeing to a federal transfer and wanted to ensure no efforts were made to transfer him absent his express written consent. Defendants' counsel did not respond to that communication.

18. A few days later, on May 12, 2025, Mr. Muhammad attended a different mediation, this time for his Modesty case, where Director Payne is a defendant. William Straughn, the Deputy Director of Institutions within the Arkansas Division of Correction, attended that mediation for the ADC. Deputy Director Straughn reports to Director Payne. Plaintiff's and defendants' teams sat in separate rooms throughout the day, with Judge Harris serving as mediator and switching back and forth. That mediation was successful and ended with a term sheet. The ADC agreed to accommodate Mr. Muhammad's modesty requests related to clothing. The ADC also agreed to designate Mr. Muhammad a "prevailing party," entitling him to attorney's fees under 42 U.S.C. § 1988.

19. As part of the May 12, 2025, mediation, the idea of a transfer came up again and Mr. Muhammad and his counsel rejected it as off the table. Mr. Muhammad informed opposing

8

counsel and Judge Harris that he was strongly opposed to a federal transfer and did not believe it was an appropriate solution to resolve the Modesty case (or any other case).

    **C.**    **After Mediation, the ADC Unilaterally Decided to Transfer Mr. Muhammad to a Federal Facility.**

    20.    After the May 8 mediation, Director Payne initiated a request to transfer Mr. Muhammad to the Federal Bureau of Prisons. It typically takes a month to process paperwork for transfers from state to federal prison.

    21.    Counsel for defendants in the Jailhouse Lawyer case first notified Mr. Muhammad's counsel on Tuesday, June 3, 2025, that the ADC was expected to receive an acceptance letter from the Federal Bureau of Prisons for Mr. Muhammad's transfer that week. Mr. Muhammad would then be transferred shortly afterwards.

    22.    Plaintiff's counsel promptly informed defendants' counsel that Mr. Muhammad had not agreed to a federal transfer, and that he objected to a transfer under these circumstances.

    23.    Defendants' counsel informed Mr. Muhammad's counsel on Thursday, June 5, 2025, that the ADC had received the formal acceptance letter from the Federal Bureau of Prisons and Mr. Muhammad would be transferred shortly.

    24.    Between June 3, 2025, and June 6, 2025, Plaintiff's counsel repeatedly requested that defendants pause the transfer plans pending further discussions, and defense counsel repeatedly refused. In communications with Plaintiff's counsel and in filings with the court during this timeframe, defense counsel repeatedly stated that Mr. Muhammad was being transferred because he "requested" to be transferred. *See, e.g.*, Amended Response to Motion for TRO, ECF No. 152, *Holt v. Payne*, Case No. 4:22-cv-01132-KGB (E.D. Ark. June 6, 2025). However, as defendants and defense counsel were aware from their participation in the May 8 and May 12 mediations, Mr. Muhammad did not request a transfer and was in fact actively opposed to one.

**D.    Mr. Muhammad Learns about the Imminent Federal Transfer.**

25.    Mr. Muhammad did not personally learn about the federal transfer plan until Thursday, June 5, 2025.  On that afternoon, Mr. Muhammad was called down to take a new institutional photograph and was instructed to start boxing up his cell and his legal papers stored in Deputy Warden Culclager's office.

26.    Deputy Warden Culclager told Mr. Muhammad that Director Payne initiated the federal transfer request because of the May 8 mediation.  Deputy Warden Culclager also told Mr. Muhammad that Deputy Director Straughn, who attended the May 12, 2025, mediation, was involved in the decision to transfer Mr. Muhammad to a federal facility.

27.    Later in the afternoon of June 5, 2025, Lieutenant Karma Thorns informed Mr. Muhammad that, as soon as his legal property was boxed up, officers planned to move him to administrative segregation pending the arrival of the federal marshals.  Lieutenant Thorns told Mr. Muhammad that the Unit's leadership planned to deny Mr. Muhammad access to his phone or his tablet in the interim so that Mr. Muhammad would not be able to contact his counsel.  Lieutenant Thorns further commented: "Holt, you know these people are tired of you. You've had them over a barrel for a long time."

28.    Mr. Muhammad interpreted Lieutenant Thorns's comment about people being "tired" of him to be a reference to Mr. Muhammad's litigation.  Mr. Muhammad understood Director Payne and the ADC to be seizing on an opportunity to moot most, if not all, of his litigation against the ADC by transferring him out of Arkansas and to a federal facility.

29.    On the afternoon of June 6, 2025, Deputy Warden Culclager again instructed Mr. Muhammad to box up his cell to prepare for a federal transfer.  Deputy Warden Culclager told Mr. Muhammad that he had been instructed by Deputy Director Straughn to ship all of Mr.

Muhammad's legal papers outside of the Unit. Mr. Muhammad expressed a concern that the ADC unilaterally shipping his legal property outside of the Unit without his consent would violate a litigation hold imposed by the court on December 15, 2023, in the Jailhouse Lawyer case. Deputy Warden Culclager responded that he was willing to "take the bullet on that one."

30.    On the afternoon of June 6, 2025, Director Payne confirmed that the plan was to swiftly start the transfer process and revoke Mr. Muhammad's access to counsel. Director Payne stated in a sworn declaration in the Jailhouse Lawyer case that, "like all inmates who are informed they are being transferred, inmate Holt was moved to administrative segregation and denied telephone access until the transfer for the safety and security of the officers who would be transporting him to the Federal Bureau of Prisons."

31.    At the time of that sworn declaration Mr. Muhammad was still in his ordinary cell. One or two hours after Director Payne's declaration was filed, Deputy Warden Culclager informed Mr. Muhammad that there were no plans to move him to administrative segregation, stating, "You aren't being locked up. You haven't done anything wrong."

32.    Mr. Muhammad was not moved to administrative segregation on June 6, 2025. He remained in his 2 Barracks cell overnight, with access to his tablet and the ability to make phone calls during regular hours.

### E.    Mr. Muhammad Is Transferred to USP Hazelton and Kept in Solitary Confinement.

33.    Shortly after midnight on Monday, June 9, 2025, the ADC began physically transferring Mr. Muhammad. Deputy Warden Culclager woke him up abruptly. Deputy Warden Culclager and another staff member, Lieutenant Jordon Slayden, recorded the transfer process on their cell phones until Mr. Muhammad left on the federal transfer van. Another staff member, Captain Bass, told Mr. Muhammad as he was packing up his cell that "something isn't right here."

34.     The ADC did not let Mr. Muhammad take any property with him, including his legal papers related to his active cases.  Counsel for the ADC informed Plaintiff's counsel later that day that Mr. Muhammad's boxes of legal papers were "being kept safe at the Norris Unit." As far as Mr. Muhammad is aware, his legal papers remain there.

35.     Mr. Muhammad was loaded onto a transport van and driven 13 hours to USP Hazelton in West Virginia.  He was not given any food, water, or bathroom breaks during his 13-hour drive.

36.     USP Hazelton, known as "Misery Mountain," is a notoriously dangerous high-security federal prison.  A 2024 Report (No. 24-041) from the U.S. Department of Justice Office of the Inspector General concluded that USP Hazelton is the second-deadliest federal prison in the country.

37.     When Mr. Muhammad arrived at USP Hazelton on June 9, 2025, the personnel at USP Hazelton were not expecting him.  It took them a while to locate his paperwork and figure out what was going on.  Different prison employees said he was supposed to be at a federal prison in the jurisdiction of the "Grand Prairie" region in the south, or at a medium-security facility and not a maximum-security one.  The admitting sergeant eventually told Mr. Muhammad that his transfer paperwork from Arkansas said he was being transferred because he could not get along with other Muslim prisoners in Arkansas.

38.     The personnel at USP Hazelton placed Mr. Muhammad in a Special Housing Unit—i.e., solitary confinement—at the maximum-security level.  Mr. Muhammad has since been informed by staff and another prisoner that there are (false) rumors being spread in the prison that he is a child molester.  Although he is eligible to get out of solitary confinement, in light of those

rumors and USP Hazelton's violent reputation, he is scared for his own safety if he were to enter the general population.

**F.    Mr. Muhammad Remains under ADC Jurisdiction and Legal Custody.**

39.    Mr. Muhammad was transferred to USP Hazelton under the Interstate Corrections Compact, which allows for administrators and judicial officers to transfer prisoners between different correctional centers, state or federal.  The Interstate Corrections Compact is codified into Arkansas law.  Ark. Code Ann. § 12-49-102 (2024).  The compact provides that "inmates confined in an institution pursuant to the terms of this compact shall at all times be subject to the jurisdiction of the sending state," with "the receiving state to act in that regard solely as agent for the sending state."  *Id.* at Art. IV(c), Art. IV(a).  "The United States of America" is included within the definition of "state" under the compact.  *Id.* at Art. II(a).  As of the date of this Complaint, Mr. Muhammad remains in ADC's legal jurisdiction.

40.    According to the Arkansas Department of Corrections' online inmate search, Mr. Muhammad's "Facility" is listed as "Interstate Compacts."  According to the Federal Bureau of Prisons online inmate search, Mr. Muhammad's "Release Date" is listed as "State Pris."

**G.    Mr. Muhammad Had No Available Administrative Remedies Against a Retaliatory Transfer.**

41.    Back at the Larry B. Norris Unit, Mr. Muhammad wrote and submitted grievances on his then-planned retaliatory transfer to federal prison on June 5, 2025, and June 6, 2025.  Although ADC policy does not ordinarily permit grievances regarding transfers, claims of retaliation must be grieved.  Ark. Dep't of Corr. Directive No. 19-34 § 3(H) (Dec. 12, 2019).  ADC policy also has a 3-step process for resolving grievances that typically takes 30 days to complete.  ADC policy provides for a response to step one of a grievance within three working days.  (In Mr. Muhammad's experience, he often does not receive any response at step one.)  Because Mr.

Muhammad was transferred around midnight the morning of June 9, 2025, he did not receive a grievance response to step one. There was no opportunity to complete the entire 30-day process before he was transferred to a federal facility. Now that Mr. Muhammad is at a federal facility, he has no access to any grievance paperwork, communications with ADC employees, or other legal materials to continue to pursue the grievances against the ADC. There is thus no administrative remedy available for Mr. Muhammad to grieve his retaliatory transfer.

### H. Mr. Muhammad Is Being Irreparably Harmed by an Imminent Federal Transfer.

42.    During his years at the Larry B. Norris Unit in Arkansas, Mr. Muhammad had a favorable classification status. Mr. Muhammad has been at the highest level of good-behavior classification in Arkansas for at least eight years and had a wide range of privileges as a result. In Arkansas, Mr. Muhammad was regularly able to move around the Larry B. Norris Unit without shackles or escorts, and was able to have contact visits with legal counsel. He also had access to a personal tablet from which he could call one or more counsel on his five represented cases every day. Effectively all of Mr. Muhammad's classification benefits have been revoked as a result of the retaliatory transfer.

43.    Since his June 9, 2025, transfer to a federal facility, Mr. Muhammad has experienced severely diminished access to basic services and legal materials compared to the Larry B. Norris Unit.

44.    Mr. Muhammad's experience thus far of the conditions at "Misery Mountain" are ones of severe understaffing and neglect. When Mr. Muhammad first arrived, the toilet in his cell was broken and stopped up without any repairs for approximately ten days. His repeated requests to repair it were ignored. Mr. Muhammad has also lacked access to personal hygiene supplies. He has repeatedly requested shampoo but has been ignored. His hair is matted and has not been

properly washed in a month. He has also requested information about how to access his commissary account, because he expects friends or family may have put money on it to help him procure supplies, but has been ignored.

45.     Mr. Muhammad's medical records and prescriptions do not appear to have transferred with him from Arkansas, and so he has not received his regular medications for 30 days. Approximately 20 days after his arrival he began to feel very sick. He has lost his appetite, is dehydrated, is losing weight, and has a raspy voice. He has repeatedly requested to see medical staff but has been ignored.

46.     Over the last month, Mr. Muhammad has had no access to phones, pens, books, the library, legal papers, the law library, commissary, or religious services. Recently he received a piece of legal mail and was able to get some writing paper, but he still has no pen. He has requested grievance forms at the facility but has been ignored.

47.     Mr. Muhammad has no access to a phone or tablet in his cell. Over the last month, Mr. Muhammad has attempted to schedule outgoing phone calls to legal counsel, but his requests have been denied or ignored. Even though at least one counsel is now on his approved list, and he has her phone number memorized, he cannot place outgoing calls.

48.     From the outside, legal counsel has repeatedly tried to establish contact with Mr. Muhammad and has also been ignored. Over the last nine years while Mr. Muhammad resided at the Larry B. Norris Unit in Arkansas, Mr. Muhammad commonly spoke to one or more of his legal counsel multiple times per week. Since being transferred to USP Hazelton, he has had just two calls with counsel in 30 days, both of which were exceptionally difficult to schedule. Calls ring for an hour without anyone picking up, get dropped upon transfer, result in error tones, and get

sent to full voicemail boxes; scheduling requests have been consistently ignored for a week or more at a time.

49.     After weeks of effort, USP Hazelton finally confirmed an in-person legal visit between counsel and Mr. Muhammad in West Virginia for the morning of July 7, 2025. Counsel showed up that morning only to be turned away at the door and denied a meeting with Mr. Muhammad. Counsel was informed that the facility had either failed to process or lost the approved legal visitation paperwork. Management at USP Hazelton apologized to counsel and referred to the incident as a "debacle," while admitting such breakdowns are unfortunately commonplace.

50.     The counselor responsible for scheduling legal calls and visits with Mr. Muhammad called counsel on July 9, 2025, to set up a rescheduled legal visit and phone call. The prison counselor expressed surprise at the frequency with which legal counsel was trying to contact Mr. Muhammad. The counselor then volunteered that, in her experience, if a prisoner has active litigation in another state's jurisdiction, the Bureau of Prisons typically requests the prisoner be transferred to the local state prison system. She said the typical practice is to house the prisoner near the court during the pendency of the litigation to help ensure ready access to the courts. She expressed confusion about why Mr. Muhammad, a prisoner with good behavior, had been transferred from Arkansas to West Virginia while six cases were ongoing.

51.     Several of Mr. Muhammad's legal cases are likely to be adversely affected by the transfer. The June 9, 2025, transfer blocked his deposition from occurring in his STTG case. On July 3, 2025, the ADC moved to dismiss the action as moot. The transfer will likely also prevent him from timely filing a motion for summary judgment in the STTG case. The transfer is also preventing him from participating in a remote hearing with the Arkansas Claims Commission in

his *Racial Muslim* case scheduled for July 11, 2025. In the Jailhouse Lawyer case, the ADC has filed papers expressing that "ADC has no intention of requesting that Plaintiff be transferred back to Arkansas." ECF No. 160 at 2.

52.    Mr. Muhammad is typically an active client but is now unable to communicate his preferences to his counsel across his active cases about how to strategically proceed, including with potential amendments, pending discovery, pending or upcoming summary judgment motions, pending or upcoming appeals, and the upcoming fee motion in the Modesty case.

53.    Mr. Muhammad's transfer has also completely severed his ability to assist his fellow ADC prisoners at the Larry B. Norris Unit—a core activity at issue in the Jailhouse Lawyer case for which he is being retaliated against. Mr. Muhammad was actively working on two boxes worth of cases for fellow prisoners at the time of his abrupt transfer. By moving him to a federal facility, Defendants instantly terminated his legal assistance to an entire population of prisoners who rely on him, and for whom Mr. Muhammad has obtained notable successes. This harm cannot be undone later, as others stand to miss deadlines and lose access to work product without Mr. Muhammad's assistance. Transferring Mr. Muhammad is an act of retaliation aimed to cause strategically outsized damage—not just to him, but also to his assistance for other prisoners' active cases.

54.    Finally, Mr. Muhammad's transfer has severely impaired his ongoing work on his state criminal case. In particular, Mr. Muhammad recently received notice that having already served 15 years he is now eligible to request a second look at his sentence. Mr. Muhammad is also eligible to submit a clemency application to the Arkansas Governor. Mr. Muhammad was working on both of those petitions at the time of his transfer. None of his criminal case files or work product were transferred with him to the federal penitentiary. He has lost all of his records and work

product, and does not know if or when he will see them again. Mr. Muhammad's hope that he will be able to use the law to get out of prison is rapidly diminishing.

**I.    The ADC's Unilateral Federal Transfer Has Chilled Mr. Muhammad's Ability to Litigate and His Willingness to Mediate Against the ADC.**

55.    This ordeal has made Mr. Muhammad loathe to ever trust the mediation process or participate in a mediation with the ADC (or any other government actor) again. Even in advance of the May 8 and May 12 mediations, Mr. Muhammad was apprehensive about participating in them. Mr. Muhammad was wary that the ADC would not negotiate in good faith. He nonetheless chose to attend and participate in both mediations out of respect for the judicial mediation process, the mediators' assurances that discussions would be confidential, and the possibility that mediation could help move the ball forward on securing accommodations and achieving mutually agreeable resolutions. Mr. Muhammad has worked hard for a decade to build credibility within the ADC and the Eastern District of Arkansas. He has not been involved in gang activity, violent fights, or drugs. He just wants to practice his Muslim faith, do his legal work, and help others pursue justice. Mr. Muhammad hoped that the reality of his legal skill and the sincerity of his faith would be apparent to all participants during in-person mediations.

56.    Instead of reaching a mutually agreeable resolution to Mr. Muhammad's Jailhouse Lawyer litigation, however, the ADC has punished and retaliated against him. Director Payne got the idea to transfer Mr. Muhammad to a federal facility from the May 8, 2025 mediation. Director Payne then pursued the transfer dialogue with the Bureau of Prisons unilaterally, without Mr. Muhammad's knowledge or consent. All the while, the ADC ignored multiple requests for updates from Mr. Muhammad's counsel.

57.    Director Payne undertook the federal transfer request process specifically to moot out Mr. Muhammad's meritorious litigation. But for Mr. Muhammad's lawsuits against the ADC

and his decision to risk participating in mediations, he would not have been transferred to federal prison. Now, across multiple matters, he has lost years of factual and case records, years of legal research, years of work product, and years of progress towards religious accommodations and injunctive relief. He has also been severely hindered in his ability to communicate with counsel, and his health is deteriorating. This all occurred because the ADC chose to retaliate against Mr. Muhammad's First Amendment right to litigate rather than mediate in good faith.

**COUNT I**
**RETALIATION AGAINST FIRST AMENDMENT PROTECTED LITIGATION**
**42 U.S.C. § 1983**

58.     Mr. Muhammad incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

59.     Arkansas Department of Corrections officers and administrators are state actors who may be sued for federal constitutional violations in federal court pursuant to 42 U.S.C. § 1983.

60.     The First Amendment to the U.S. Constitution provides in relevant part: "Congress shall make no law ... abridging the freedom of speech, or ... to petition the Government for redress of grievances."

61.     The First Amendment is incorporated against the State of Arkansas and its officers through the Fourteenth Amendment.

62.     Prison officials may not retaliate against prisoners for exercising their First and Fourteenth Amendment rights to engage in litigation, or for negotiating in good faith during mediation attempting to resolve litigation.

63.     Director Payne transferred Mr. Muhammad to a federal facility in retaliation for exercising his constitutional right to litigate.

64.     Director Payne made the decision to transfer Mr. Muhammad to a federal facility as a direct result of what occurred during mediations on May 8 and May 12, 2025.

65.     But for the retaliatory motive, ADC would not have transferred him to a federal facility. Director Payne's purpose and motivation in requesting and pursuing this transfer to a federal facility was to frustrate and potentially end or moot Mr. Muhammad's active litigation against the ADC, including Mr. Muhammad's legal assistance to fellow ADC prisoners.

66.     The reasons that Defendant has stated for Mr. Muhammad's transfer are pretextual. Director Payne knows that Mr. Muhammad did not request a federal transfer and knows that Mr. Muhammad in fact objected to any federal transfer absent his express written consent. Nor did any conflict with other Muslim prisoners actually motivate the transfer. Director Payne seized on the idea of a federal transfer anyway as an option to rid the ADC of Mr. Muhammad and to end his litigation against the ADC once and for all. Director Payne and others at the ADC were frustrated by Mr. Muhammad's legal work, for himself and others, *because* Mr. Muhammad raises meritorious claims.

67.     Director Payne and others at the ADC have already begun to file motions to dismiss Mr. Muhammad's cases and requested relief as moot because the ADC chose to transfer him to a federal facility.

68.     Director Payne's retaliatory motive can be inferred by how close in time the adverse actions were to key legal events, including the May 8, 2025, mediation in the Jailhouse Lawyer case and the May 12, 2025, mediation in the Modesty case. It typically takes a month to complete a state-to-federal prison transfer request, and Mr. Muhammad was transferred on June 9, 2025.

69.     Director Payne's actions in requesting a federal transfer were not reasonably related to legitimate penological objectives. Mr. Muhammad has maintained good behavior and a high

20

classification status for years. And there was no overcrowding at the Larry B. Norris Unit set forth as the basis for the transfer.

70.    Rather, the decision to transfer Mr. Muhammad out of the Larry B. Norris Unit f/k/a Maximum Security Unit was motivated by the desire to cut off Mr. Muhammad's litigation against the ADC, and thereby reduce the risk that a court might order the ADC to do more to accommodate Mr. Muhammad's civil rights under the U.S. Constitution and the Religious Land Use and Institutionalized Persons Act. The transfer has already had the practical effect of permitting the ADC to ignore the two separate permanent injunctions Mr. Muhammad has obtained against them, in his Beard and Modesty cases.

71.    Director Payne's adverse actions against Mr. Muhammad would chill a prisoner of ordinary firmness from litigating meritorious cases against or mediating with the ADC.

72.    Director Payne's adverse actions against Mr. Muhammad have chilled Mr. Muhammad from being willing to negotiate or mediate with the ADC to resolve other litigation again. Because the mediations triggered ADC's unilateral adverse transfer action against Mr. Muhammad, Mr. Muhammad can no longer trust that the proceedings will be kept confidential, or that the purpose of mediation is to make progress towards a mutually agreeable solution. Mr. Muhammad no longer trusts that the ADC will negotiate in good faith.

73.    The ADC retains legal custody and jurisdiction over Mr. Muhammad because he is imprisoned pursuant to Arkansas law, and therefore Director Payne has the power and authority to have Mr. Muhammad be transferred back to Arkansas prison facilities.

74.    Plaintiff seeks declaratory and injunctive relief on his First Amendment retaliation claim.

## PRAYER FOR RELIEF

Plaintiff requests that this Honorable Court enter judgment in his favor and against Director

Payne on the retaliation claim in this Complaint, and issue an order awarding the following relief:

1.    A declaratory judgment that Director Payne has violated Mr. Muhammad's First

and Fourteenth Amendment rights to be free from retaliation by initiating a federal

transfer in response to Mr. Muhammad's active litigations, legal work, and

participation in mediations;

2.    Preliminary and permanent injunctive relief requiring Director Payne to request and

facilitate the transfer of Mr. Muhammad back to ADC custody and to the Larry B.

Norris Unit f/k/a Maximum Security Unit;

3.    Costs, including reasonable attorney's fees, under 42 U.S.C. § 1988; and

4.    Any such other relief as this Court may deem just and proper.

Dated: July 10, 2025                    Respectfully submitted,

By: _____
JOHN C. WILLIAMS (Ark Bar No. 2013233)
ACLU of Arkansas
904 W. 2nd St.
Little Rock, AR 72201
Telephone: (501) 374-2842
Email: john@acluarkansas.org

CAROLYN M. HOMER (admitted in E.D. Ark.)
ADITYA V. KAMDAR (*pro hac vice forthcoming*)
MORRISON & FOERSTER LLP
2100 L St., NW, Suite 900
Washington, D.C. 20037
Telephone: (202) 887-1500
Facsimile: (202) 637-2201
Email: cmhomer@mofo.com

*Attorneys for Plaintiff*

## VERIFICATION

Under penalty of perjury, I declare that the facts alleged in the foregoing Complaint are true and correct to the best of my knowledge and belief.  I verbally reviewed and provided my edits to the facts alleged in this Complaint on June 8, 2025 and July 9, 2025.  Because my Counsel has been denied physical access to me it has been impossible for me to provide a wet signature to this Complaint.  I verbally authorized my counsel to type my signature on this Complaint on the afternoon of July 9, 2025.  At the time of my authorization, I was speaking to my counsel on the telephone in USP Hazelton in Bruceton Mills, West Virginia.

/s/ *Gregory Houston Holt, Abdul Maalik Muhammad*