IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUL 1 0 2025

TAMMY H. DOWNS, CLERK

By: _____
DEP CLERK

Gregory Holt, ADC # 129616
a/k/a **Abdul Maalik Muhammad**

*Plaintiff,*

v.

**DEXTER PAYNE,**

*Defendant.*

Case No.

4:25-cv-699-LPR-JJV

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Plaintiff Gregory Holt a/k/a Abdul Maalik Muhammad, a prisoner in the legal custody of the Arkansas Department of Correction ("ADC"), seeks a preliminary injunction ordering his immediate return to the Larry B. Norris Unit in Arkansas. On June 9, 2025, the ADC abruptly transferred Mr. Muhammad from the facility where he had been housed for nearly a decade to a notoriously dangerous federal penitentiary in West Virginia. Though the ADC pretextually informed the federal authorities that Mr. Muhammad was being transferred because he was unable to get along with other Muslim prisoners, his transfer actually was an illegal act of retaliation, calculated to punish Mr. Muhammad for his history of successful litigation against the ADC and to moot his six currently pending civil rights lawsuits by physically removing him from the state.

The ADC's retaliatory motive is not subtle. The decision to transfer Mr. Muhammad was personally initiated by Defendant Director Dexter Payne immediately following confidential mediation related to Mr. Muhammad's litigation. Since the transfer, the ADC has already begun

moving to dismiss Mr. Muhammad's lawsuits as moot, consistent with the transfer's true purpose. The transfer has caused immediate and irreparable harm, severing Mr. Muhammad's access to his legal files and counsel and threating to extinguish his ability to prosecute his meritorious claims. Plaintiff respectfully requests that this Court issue a preliminary injunction ordering Defendant to reverse the retaliatory transfer.

## I.    RELEVANT FACTUAL BACKGROUND

Mr. Muhammad is a prisoner in the legal custody of the ADC who now resides at a federal penitentiary in West Virginia following a retaliatory transfer by Defendant. Verified Complaint ("Compl."), ECF No. 1, ¶¶ 33, 35–38. The transfer was designed to punish Mr. Muhammad for his successful litigation activities and to moot his numerous pending civil rights cases against the ADC. *Id.* ¶ 14.

### A.    Mr. Muhammad Is a Prolific and Successful Litigant Against the ADC.

Mr. Muhammad is a frequent litigant in meritorious cases that not only survive dismissal, but that ultimately prevail. *Id.* Over the past decade, his petitions challenging the policies of the ADC have led to significant legal victories, including a unanimous U.S. Supreme Court decision. *Id.* ¶ 2; *see Holt v. Hobbs*, 574 U.S. 352 (2015).

Mr. Muhammad currently has six active cases pending against the ADC and its officials (Compl. ¶ 14):

a. *Holt v. Payne*, Case No. 4:22-cv-01132-KGB (E.D. Ark.) ("Jailhouse Lawyer case"). Chief Judge Baker has authorized all five asserted claims to proceed to discovery. *See* Ex. A (Order, *Holt v. Payne,* No. 4:22-cv-01132-KGB, ECF No. 133 (March 10, 2025)). Judge Volpe held a confidential mediation on May 8, 2025, which was not successful.

b. *Holt v. Payne*, Case No. 5:19-cv-00081-BSM (E.D. Ark.), on remand from Case No. 22-01809 (8th Cir.) ("Jummah case"). Mr. Muhammad's summary judgment motion is pending before Judge Miller.

c. *Holt v. Higgins*, Case No. 4:21-cv-01226-JM-JTK, 2022 WL 18027626 (E.D. Ark. Dec. 30, 2022) ("Security/Terrorist Threat Groups case" or "STTG case"). Discovery in this matter was wrapping up, with the parties working to schedule Mr. Muhammad's deposition, when Mr. Muhammad was abruptly transferred on June 9, 2025. On July 3, 2025, the ADC asked Judge Moody to dismiss the case as moot in light of Mr. Muhammad's transfer. *See* ECF No. 50.

d. *Holt v. Payne*, Case No. 4:22-cv-00553-JM-PSH (E.D. Ark.) ("Modesty case"). The parties reached a settlement during a mediation before Judge Harris on May 12, 2025. Judge Harris issued an order outlining the terms of the settlement on June 26, 2025, and stated that Mr. Muhammad's motion for fees and costs is due July 31, 2025.

e. *Holt v. Payne*, Case No. 4:24-cv-00074-BRW-ERE (E.D. Ark.), on appeal at Case No. 25-01507 (8th Cir.) ("Ramadan case"). Mr. Muhammad's opening appellate brief was submitted on June 5, 2025.

f. *Holt v. Ark. Div. of Corr.*, Case No. 231473 (Ark. Claims Commission) ("*Racial Muslim* case"). Discovery has ended, and a *Daubert* hearing to exclude the declaration of Maurice Culclager (Deputy Warden of the Larry B. Norris Unit) is scheduled for July 11, 2025. Mr. Muhammad represents himself *pro se* in that case and has been unable to access his case file or inform the Court about his transfer.

**B.    Following Key Litigation Victories, Defendant Unilaterally Initiated the Transfer of Mr. Muhammad.**

On March 10, 2025, the court in his Jailhouse Lawyer case denied defendants' motion to dismiss, allowing all five of Mr. Muhammad's claims to proceed.  Compl. ¶ 14; *see also* Ex. A. The parties promptly agreed to mediate in an attempt to resolve that litigation before discovery began in earnest.  *Id.* ¶ 15.  That mediation took place on May 8, 2025, with Mr. Muhammad attending in person and Defendant Director Payne participating by phone.  *Id.* ¶ 16.

That mediation was unsuccessful.  *See id.*; *see also* Ex. B.  The mediator—Judge Volpe— suggested the possibility of a federal transfer as a potential resolution, and Mr. Muhammad entertained the possibility in the spirit of the mediation.  Compl. ¶ 17.   But he also expressed hesitance, indicating his longstanding position that any unilateral transfer would be an act of retaliation.  *Id.*   Ultimately, no agreement was reached, and Plaintiff's counsel immediately followed up in writing to state that Mr. Muhammad had deep concerns and opposed any transfer absent his "express written consent."  *Id.*; Ex. C.

A second mediation on May 12, 2025, in the Modesty case was more successful.  The ADC agreed to accommodate Mr. Muhammad's religious modesty practices and designated him a "prevailing party," entitling him to seek attorneys' fees.  Compl. ¶ 18.   During this second mediation, Mr. Muhammad reiterated that he was strongly opposed to a federal transfer.  *Id.* ¶ 19.

There have been material updates in other actions as well.  Mr. Muhammad has summary judgment pending in his Jummah case, an Eighth Circuit appeal pending in his Ramadan case, discovery ending and summary judgment starting soon in his STTG case, and a *Daubert* hearing scheduled for July in his *Racial Muslim* book case.  *See id.* ¶ 14.  All of those cases assert claims against the Arkansas Department of Corrections and its officers.

Following Mr. Muhammad's mediations, Director Payne personally initiated a request to transfer Mr. Muhammad to the Federal Bureau of Prisons. Ex. D, ¶ 6. He did so based on conversations that occurred at the May 8 mediation. *Id.* ¶¶ 5-6; *see also* Compl. ¶ 26. Defendant proceeded with the transfer in order to end Mr. Muhammad's litigation—over his express objections—and refused multiple requests from his counsel to pause the process. Compl. ¶ 24.

### C.    The Transfer Was Executed Under Pretext and Has Caused Immediate Harm.

On June 9, 2025, Deputy Warden Culclager woke Mr. Muhammad up shortly after midnight and transported him 13 hours to USP Hazelton in West Virginia, a notoriously dangerous prison known as "Misery Mountain." *Id.* ¶¶ 33–36. He was not permitted to take any of his property, including his legal papers key to his cases, and was not given food, water, or bathroom breaks during the entire drive. *Id.* ¶ 34.

The official reason provided on his transfer paperwork was that Mr. Muhammad had conflicts with and could not get along with other Muslim prisoners in Arkansas. *Id.* ¶ 37. This pretext is directly contradicted by Deputy Warden Culclager, who told Mr. Muhammad just before the transfer, "You aren't being locked up. You haven't done anything wrong." *Id.* ¶ 31. Upon arrival at USP Hazelton, Mr. Muhammad was placed in solitary confinement, where the toilet in his cell was stopped up without any repairs for approximately ten days. *Id.* ¶ 44. He has not received his regular medications for a month, since his medical records and prescriptions do not appear to have transferred with him from Arkansas. *Id.* ¶ 45. He has started to feel very sick, but his repeated requests to see medical staff have been ignored. *Id.* Over the last month, he has had no access to phones, the library, commissary, religious services, or his legal files. *Id.* ¶ 46. His repeated attempts to schedule outgoing phone calls to legal counsel have been denied or ignored. *Id.* ¶ 47. His legal counsel, at the same time, has been forced to go through herculean efforts to

establish contact—and many of these efforts have been frustrated, including showing up in West Virginia for a confirmed in-person legal visit, only to be told that there was a paperwork issue. *Id.* ¶¶ 48–49.

Since the transfer, the ADC has begun filing motions arguing Mr. Muhammad's claims against them are now moot. *Id.* ¶ 51.

## II.    LEGAL STANDARD

In determining whether to grant a motion for a preliminary injunction, a court must consider (1) the likelihood of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between the harm to the movant and the injury that granting an injunction would cause other interested parties; and (4) the public interest. *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). While courts must balance all four *Dataphase* factors, "the probability of success [on the merits] factor is the most significant." *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022). This factor considers whether the movant has demonstrated "at least a 'fair chance of prevailing[.]'" *Wildhawk Invs., LLC v. Brava I.P., LLC*, 27 F.4th 587, 593 (8th Cir. 2022) (quoting *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1041 (8th Cir. 2016)).

## III.    ARGUMENT

Mr. Muhammad is entitled to a preliminary injunction ordering his immediate return to Arkansas. The evidence of retaliation is clear: Defendant initiated the transfer immediately following a confidential mediation and used a pretextual reason directly contradicted by the ADC's own officials. This transfer was a calculated effort to moot Mr. Muhammad's six pending civil rights lawsuits. This motive is not speculative: it was confirmed when the ADC immediately began filing motions to dismiss Mr. Muhammad's other cases on the very mootness grounds the transfer was designed to create. This Court should order Mr. Muhammad's return.

A.    **Mr. Muhammad Is Likely to Succeed on the Merits of his Retaliatory Transfer Claim.**

"[A] prisoner cannot be transferred in retaliation for his exercise of constitutionally protected rights, either between prisons in a single state, or between state and federal prisons systems under the Interstate Corrections Compact." *Rouse v. Benson*, 193 F.3d 936, 940 (8th Cir. 1999) (internal citation omitted). "[P]rison officials do not have the discretion to punish an inmate for exercising his first amendment rights by transferring him to a different institution." *Murphy v. Missouri Dept. of Correction*, 769 F.2d 502, 503 (8th Cir. 1985); *accord Gomez v. Vernon*, 255 F.3d 1118, 1129-1130 (9th Cir. 2001) (affirming district court determination that injunctive relief "is necessary to prevent future retaliatory transfers" based on prisoners' law library activities). "If a prisoner is transferred for exercising his own right of access to the courts, or for assisting others in exercising their right of access to the courts, he has a claim under § 1983." *Higgason v. Farley*, 83 F.3d 807, 810 (7th Cir. 1996). Prison officials' discretion to make transfer decisions "does not swallow the inmate's fundamental right of access to the courts. Otherwise, prison administrators would be free to accomplish . . . the transfer of successful and, therefore, troublesome litigants for no reason other than their legal activities." *Laaman v. Perrin*, 435 F. Supp. 319, 327 (D.N.H. 1977).

To prove a retaliatory transfer claim, a prisoner bears the burden to show that "but for an unconstitutional, retaliatory motive the transfer would not have occurred." *Goff v. Burton*, 7 F.3d 734, 738 (8th Cir. 1993). For example, after a remand to apply this standard in *Goff*, the district court found in favor of a prisoner's claim of retaliatory transfer and ordered the plaintiff's transfer back and awarded damages. *Goff v. Burton*, 91 F.3d 1188, 1189 (8th Cir. 1996). The Eighth Circuit affirmed, finding that the plaintiff had proven that he would not have been transferred but for the prison's retaliatory motive. *Id.* Goff was accused of alleged assault of another inmate three

days after filing suit against the correctional center and transferred to another facility. *Id.* at 1190. At trial, Goff presented evidence of his innocence of the alleged assault and of the suspicious timing and procedures in the following investigation. *Id.* at 1190–91. The district court found in his favor and ordered his transfer back to the correctional center. *Id.* at 1191.

Similarly, as explained below, Defendant transferred Mr. Muhammad to a federal facility because he exercised his constitutional rights. Defendant cannot point to any legitimate reason to transfer Mr. Muhammad, other than to moot his litigation against the ADC. As the Eighth Circuit has repeatedly held, this Court has the power to restore the status quo by reversing the transfer so that Mr. Muhammad is physically returned to the Larry B. Norris Unit.

### 1. Mr. Muhammad Is Engaged in Constitutionally Protected Activity.

The ADC transferred Mr. Muhammad as a "successful and, therefore, troublesome litigant[]," *Laaman*, 435 F. Supp. at 327, which is an act of retaliation. Mr. Muhammad, through his active litigation, was and continues to be engaged in First Amendment protected conduct. *See Beaulieu v. Ludeman*, 690 F.3d 1017, 1025 (8th Cir. 2012) (filing of inmate lawsuit is protected First Amendment activity); *cf. Human v. Rowley*, 22 F. App'x 683, 683 (8th Cir. 2001) (plaintiff stated a retaliation claim by alleging that defendants removed him from his prison job as a law clerk for doing it "too well"); *Cornell v. Woods*, 69 F.3d 1383, 1388 (8th Cir. 1995) (upholding district court's awarding of damages to plaintiff for his claim of retaliatory transfer for exercising constitutional rights). And participating in a mediation to resolve a claim is also protected activity. *Cf. Rowe v. Schulte Hosp. Grp., LLC*, No. 23-cv-326-SLP, 2023 WL 4768705, at *9 (W.D. Okla. July 26, 2023).

2. **The Transfer Was an Adverse Action Directly Caused by Mr. Muhammad's Protected Activity.**

Here, Mr. Muhammad meets the legal standard for proving a retaliatory transfer because his protected litigation activities directly caused Defendant's adverse decision to transfer him to a federal facility. Defendant Director Payne admitted on June 6, 2025, that the genesis of the federal transfer request was the May 8, 2025, mediation he attended in this matter. Ex. D ¶¶ 5, 6. Deputy Warden Culclager likewise told Plaintiff on June 6, 2025, that Director Payne decided to transfer Mr. Muhammad because of the mediation. Compl. ¶ 26. Based on a conversation with Lieutenant Karma Thorns on June 5, 2025, Mr. Muhammad understands Defendant and the ADC to have initiated this transfer because they are "tired" of him and want to stop litigating against him. *Id.* ¶ 27.

The decision to transfer Mr. Muhammad is also proximate to a significant litigation success. Just as in *Goff*, "the chronology of events surrounding . . . transfer [can give] rise to an inference of retaliation." 91 F.3d at 1191. On May 12, 2025, the ADC agreed to permanently accommodate Mr. Muhammad's request for modest clothing and agreed that Mr. Muhammad was a prevailing party, such that he could move for attorney's fees. *See* Compl. ¶ 18. Preventing the ADC from having to comply with that settlement, as well as preventing the risk of further injunctive and monetary burdens stemming from Mr. Muhammad's other active pieces of litigation against the ADC, *see id.* ¶ 14, supplied substantial temporal motivation for Defendant to choose to transfer Mr. Muhammad as soon as possible.

3. **The ADC's Proffered Justifications Are a Transparent Pretext.**

Defendant cannot show that he would have made this same decision absent Mr. Muhammad's protected litigation and mediation conduct—after all, the transfer was not imposed "for an actual violation of prisoner rules or regulations[.]" *Goff*, 7 F.3d at 738. There is no

evidence that Mr. Muhammad was involved in a "pattern of misbehavior and repeated violations of the jail's rules of conduct," and especially not in recent months, that justified the transfer. *Kind v. Frank*, 329 F.3d 979, 981 (8th Cir. 2003); *see also Ponchik v. Bogan*, 929 F.2d 419, 420 (8th Cir. 1991) (transfer would have been requested because of "serious and repetitive misconduct"). Deputy Warden Culclager's own words confirm this: on June 6, 2025, he told Mr. Muhammad, "You aren't being locked up. You haven't done anything wrong." Compl. ¶ 31. This admission is consistent with Mr. Muhammad's long-term record as residing at the Maximum Security Unit with the best possible classification status for years. Ex. E (showing "Good Time Class" as "I-C"). Further, there is no evidence that Mr. Muhammad's litigation is frivolous. If anything, it's quite the opposite: Mr. Muhammad's lawsuits against the ADC have been famously meritorious. *Holt v. Hobbs*, 574 U.S. 352 (2015) (unanimous U.S. Supreme Court opinion authorizing Mr. Muhammad to grow a beard for religious reasons). The reasons stated on Mr. Muhammad's transfer paperwork—that he had conflicts with other Muslim prisoners—is a transparent pretext directly contradicted by the ADC's own statement and positive classification of Mr. Muhammad.

Given the ADC's admissions, the timing of the key mediation and transfer-request events, and the absence of any legitimate penological justification, Mr. Muhammad's protected litigation conduct was the "but for" cause of Defendant's decision to transfer him. *See Goff*, 7 F.3d at 737–38. Mr. Muhammad has demonstrated more than a "fair chance of prevailing" on the merits of his retaliation claim. *Wildhawk*, 27 F.4th at 593.

Moreover, Mr. Muhammad has no available administrative remedies for a retaliatory transfer. Upon learning a transfer was in the works, Mr. Muhammad promptly initiated the three-step grievance process required by the ADC. *See* Compl. ¶ 41. Mr. Muhammad wrote and submitted grievances on his planned retaliatory transfer to federal prison on June 5, 2025, and June

6, 2025. *Id.* Though the ADC's policies designate transfers generally as a non-grievable issue, claims of retaliation must always be grieved. *See id.*; *see also* Ex. F, § III.F. ADC policy also has a 3-step process for resolving grievances that typically takes 30 days to complete. *See* Compl. ¶ 41; *see also* Ex. F, § IV. ADC policy guarantees a response to the grievance within three working days. Ex. F, § IV.E.4. Because Mr. Muhammad was transferred around midnight the morning of June 9, 2025, he did not receive a response or have time to complete the first step, much less the 30-day process, before he was transferred to a federal facility. Now that Mr. Muhammad is at a federal facility, he has no access to any grievance paperwork, communications with ADC employees, or other legal materials in order to continue to pursue his grievances. Administrative exhaustion is not required in this circumstance. *See Ross v. Blake*, 578 U.S. 632, 635-36 (2016) ("A prisoner need not exhaust remedies if they are not 'available.'").

### 4. The Court Has the Power to Enjoin Mr. Muhammad's Transfer.

Courts may issue injunctive relief for a violation that is ongoing in nature. Specifically, the Court may reverse Mr. Muhammad's retaliatory transfer by ordering the ADC, which retains legal custody and jurisdiction over Mr. Muhammad, to request and facilitate Mr. Muhammad's transfer back to his original location at the Larry B. Norris Unit. "A reparative injunction (also known as a restorative injunction) orders defendant to reverse or undo all or part of the violation of plaintiff's rights, or to reverse or undo some or all of the harm.... [T]ortious actions committed in the past, or tortious consequences of past actions, can sometimes be undone in the sense that the harm they cause is prevented from continuing into the future." Restatement (Third) of Torts: Remedies § 44(c) TD No 2 (2023). "It has long been established that where a defendant with notice in an injunction proceeding completes the acts sought to be enjoined the court may by

mandatory injunction restore the status quo." *Porter v. Lee*, 328 U.S. 246, 251 (1946) (citing *Tex. & New Orleans R. Co. v. Northside Belt R. Co.*, 276 U.S. 475, 479 (1928)).

This principle is deep-rooted in the Eighth Circuit, specifically regarding retaliatory transfers. As in *Goff*, where the court ordered that the plaintiff be returned to his original placement, 91 F.3d at 1191, Mr. Muhammad's litigation against prison officials, the suspicious timing involved in his transfer, and the ADC's fabricated reasons for his transfer all suggest that his transfer is retaliation for exercising his constitutional rights. The Court can order the ADC to return Mr. Muhammad to his status quo location.

While some courts have declined to order a prisoner transferred back to their original location, those cases are factually distinguishable and only serve to highlight the strength of Mr. Muhammad's claim. For example, in *Morales v. Hanks*, the court denied an injunction because the plaintiff failed to refute the prison's assessment of him as a security threat. *Morales v. Hanks*, No. 23-cv-00522-SM-TSM, 2024 U.S. Dist. LEXIS 238825, at *35 (D.N.H. Sep. 17, 2024). Here, the opposite is true: Mr. Muhammad has a credible record as a model prisoner and has maintained the highest good-behavior classification for years. More importantly, the ADC's own words confirm that any security rationale—i.e., Mr. Muhammad's supposed clashes with other Muslim prisoners—is pretextual. Deputy Warden Culclager explicitly told Mr. Muhammad just before the transfer, "You haven't done anything wrong."

Similarly, in *Holloway v. Lay*, the court found the plaintiff failed to establish a retaliatory motive because the official who recommended the transfer was not aware of the plaintiff's lawsuit. No. 5:10-cv-00067, 2011 WL 5869790 (E.D. Ark. Oct. 24, 2011). In stark contrast, Defendant and the ADC here were not only fully aware of Mr. Muhammad's extensive litigation history against them, but the transfer was a direct result of the May 8 and May 12 mediations. Unlike in

*Holloway*, where the transfer of one co-plaintiff would not have ended the case, Defendant's transfer of Mr. Muhammad is transparently designed to moot all of his pending claims for injunctive relief at once. Mr. Muhammad's circumstances much more clearly match the successful claim in *Goff*, where the court ordered the prisoner returned after finding a retaliatory transfer based on suspicious timing and fabricated reasons. The Court here can and should do the same.

**B.    Mr. Muhammad Will Suffer Immediate and Irreparable Harm if the Transfer Is Not Reversed.**

Mr. Muhammad has suffered and will continue to suffer irreparable harm absent an injunction.

*First*, and most generally, the transfer irreparably harms Mr. Muhammad by infringing on his First Amendment rights—namely, by punishing him for his First Amendment protected litigation activity. "[L]oss of First Amendment freedoms, even for minimal periods of time, unquestionably constitute irreparable injury." *Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 762 (8th Cir. 2008) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).

*Second*, the transfer threatens to foreclose Mr. Muhammad's access to the courts. Mr. Muhammad's active litigations are specifically tied to his treatment by ADC officials and conditions within ADC facilities. The very purpose of Defendant's transfer is to moot Mr. Muhammad's various claims for injunctive relief pending against the ADC. "Transfer in retaliation for challenging the conditions of his confinement … constitute[s] irreparable harm to movant, as his transfer to another facility would render his claims moot." *Parton v. White*, No.

2:81-cv-19-DDN, 2022 WL 3646161, at *4 (E.D. Mo. Aug. 24, 2022).[1]  This harm is not speculative: since his transfer to a federal facility, Defendant and the ADC have sought dismissal on mootness grounds, which would bring an unjust end to Mr. Muhammad's pending litigations, all of which have survived dismissals and proceeded to discovery.  Countenancing Defendant's unilateral decision to transfer Mr. Muhammad in retaliation for that meritorious litigation would leave his important constitutional grievances unaddressed and Defendant's alleged misconduct unchallenged.

*Third*, Mr. Muhammad has suffered and will continue to suffer physical harm unless he is transferred back to the Larry B. Norris Unit.  The conditions at USP Hazelton are characterized by severe understaffing and neglect.  Upon arrival, Mr. Muhammad was placed in a cell with a broken toilet that remained stopped up for ten days, despite his repeated requests for repair.  He has been denied basic hygiene supplies for a month.  The lack of care has led to a serious decline in Mr. Muhammad's physical health:  because his medical records and prescriptions do not appear to have transferred with him from Arkansas, he has not received his regular medication for a month.  *See* Compl. ¶ 45.  He has become very ill—he has lost his appetite, is dehydrated, is losing weight, and has a raspy voice—yet his repeated requests for medical attention have been ignored.  *Id.*  Further, the transfer has placed his physical safety in grave danger.  He has been informed by staff and another prisoner that false and inflammatory rumors are being spread that he is a child molester.  *Id.* ¶ 38.  In light of USP Hazelton's violent reputation as the second-deadliest federal prison, he is now in fear for his life should he be made to enter the general population.  *Id.* ¶ 36.

---

[1] *See also* Tamika D. Temple, *Mooted and Booted: How the Mootness Doctrine Has Been Used to Silence Violations of Constitutional Rights*, 45 T. Marshall L. Rev. 117, 130–33 (2020) (discussing several instances where prisoners were transferred strategically to moot legal claims).

This ongoing physical suffering, medical neglect, and specter of violence constitute severe and irreparable harm that would be remedied by his immediate return to Arkansas.

Mr. Muhammad has suffered and will continue to suffer irreparable harm unless Defendant's retaliatory transfer is reversed.

### C.   The Balance of Hardships and the Public Interest Fall in Mr. Muhammad's Favor.

As explained above, the harm to Mr. Muhammad is significant and potentially permanent. And consideration of the public interest "is dependent on the determination of the likelihood of success on the merits . . . because it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds*, 697 F.3d 678 (8th Cir. 2012) (en banc). The public has a profound interest in ensuring that government officials cannot punish an individual for successfully exercising his right to petition the government. Moreover, the public interest is also served by protecting the integrity of court-sponsored mediation.

Meanwhile, the harm to Defendant and the ADC is effectively nonexistent. Defendant is merely required to return to the status quo that had existed for nearly a decade—i.e., return Mr. Muhammad to the same ADC facility where he had been housed, pending further discussion between the parties and briefing before the Court. Any administrative inconvenience, such as needing to call the BOP and ask to reverse the transfer, is negligible compared to the constitutional rights at stake.

The balance of hardships and public interest weigh heavily in Mr. Muhammad's favor.

### IV.   CONCLUSION

Absent relief from this Court, Defendant will ensure Plaintiff remains out of ADC custody in order to moot his meritorious litigation. Plaintiff respectfully requests the Court immediately

and temporarily order Defendant to transfer Mr. Muhammad back to the Larry B. Norris Unit, as well as grant all other relief as the Court considers appropriate.

Dated: July 10, 2025                                  Respectfully submitted,

By: _____
JOHN C. WILLIAMS (Ark Bar No. 2013233)
ACLU of Arkansas
904 W. 2nd St.
Little Rock, AR 72201
Telephone: (501) 374-2842
Email: john@acluarkansas.org

CAROLYN HOMER (admitted in E.D. Ark.)
ADITYA V. KAMDAR (*pro hac vice forthcoming*)
MORRISON & FOERSTER LLP
2100 L St., NW, Suite 900
Washington, D.C. 20037
Telephone: (202) 887-1500
Facsimile: (202) 637-2201
Email: cmhomer@mofo.com

*Attorneys for Plaintiff*